# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ruben Castillo | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 6790 | **DATE** | 8/15/2003 |
| **CASE TITLE** | United States vs. Arthur Andersen, L.L.P. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the natu of the motion being presented.]

Petitioner's Motion to Alter or Amend this Court's July 2, 2003 Order

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Petitioner's motion to alter or amend our July 2 Order is granted for th reasons stated in the attached Memorandum Opinion and Order. (R. 78-1.) The identities of the Doe and Poes and any other Andersen Doe who has not yet been disclosed must be revealed to Petitioner. W deny the Does' request for a determination of the responsiveness of its transaction to the IRS summonse (R. 52-1.)

(11) ☐ [For further detail see order (on reverse side of/attached to) the original minute order.]

| | No notices required, advised in open court. | | 11 number of notices | Document Number |
|---|---|---|---|---|
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | 8-15-03 date docketed | |
| ✓ | Notified counsel by telephone. | | | 89 |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | U.S. DISTRICT COURT CLERK | 8/15/2003 | |
| | Copy to judge/magistrate judge. | 03 AUG 15 AM 10:28 | date mailed notice | |
| RC | courtroom deputy's initials | FILED FOR DOCKETING Date/time received in central Clerk's Office | RC7 mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) ) Petitioner, ) ) v. ) ) ARTHUR ANDERSEN, L.L.P., ) ) Respondent, ) _____) ) JOHN and JANE DOES, PAUL and PAULINE ) POE, et al., ) ) Intervenors. ) | No. 02 C 6790<br><br>Judge Ruben Castillo |

## MEMORANDUM OPINION AND ORDER

As detailed in the summary of the relevant procedural history of this case, this is far from a routine tax summons enforcement action. Presently before the Court is Petitioner United States of America's ("Petitioner") Motion to Alter or Amend this Court's July 2, 2003 Order upholding Intervenors John and Jane Does' and Paul and Pauline Poes' (collectively "Intervenors") assertion of a privilege over their identities pursuant to 26 U.S.C. § 7525(a). Petitioner also seeks an order compelling Respondent Arthur Andersen ("Andersen") to disclose the identities of any remaining Does who failed to timely intervene in this action to assert an identity privilege. For the following reasons Petitioner's motion is granted. (R. 78-1.)

### RELEVANT FACTS

Andersen was in the business of providing accounting, tax and consulting services to its clients. On April 19, 2002, the Internal Revenue Service served nineteen summonses on Andersen, seeking information about tax-advantaged transactions on which Andersen had



advised its clients. On September 23, 2002, Petitioner filed a petition in this Court to enforce the summonses. According to the petition, Petitioner sought to enforce the summonses "as a part of an investigation into whether Andersen may be liable for promoter penalties . . . for the years 1995 through 2002, inclusive." (R. 1, Pet. at 1.) The petition further describes the IRS's efforts over two years to obtain the information from Andersen prior to filing a lawsuit to enforce their requests. After this Court entered an Order to Show Cause, Petitioner and Andersen entered into an Agreed Order. We approved the Agreed Order on November 18, 2002. Under the terms of the Agreed Order, Andersen notified certain of its former clients that it was going to identify them to the IRS and produce documents relating to those transactions unless the client notified Andersen that it wished to assert a privilege with respect to some or all of the information to be disclosed, including the former client's identity.

Subsequently, forty former Andersen clients informed the company that they wished to assert a privilege in their identities. Andersen informed Petitioner of the former clients' privilege claim and withheld their identities from the Petitioner. Thereafter, Petitioner filed a number of motions to compel compliance with various provisions of the Agreed Order. Specifically, on January 27, 2003, Petitioner moved to compel compliance with paragraph 1E of the Agreed Order, which required Andersen to produce "[a] list of all investors (including name, address, and taxpayer identification number)," who engaged in one of two identified transactions. (R. 12, Agreed Order at 1.) In the interim, two groups of the Does whose identities Andersen had withheld from the government intervened to assert an identity privilege under 26 U.S.C. § 7525. One group of taxpayers moved to intervene as the John and Jane Does and the other group

moved to intervene as Paul and Pauline Poe. We ordered briefing on the following issues: (1) whether the Does and Poes could intervene under fictitious names; and (2) whether the Does and the Poes could properly invoke an identity privilege pursuant to 26 U.S.C. § 7525(a).

Meanwhile, the government continued filing various motions to compel compliance with other provisions of the Agreed Order. On March 17, 2003, Petitioner filed a motion to compel compliance with paragraph 2B of the Agreed Order, which required Andersen to produce "[a] list (including name, address and taxpayer identification number) . . . of investors that engaged in the Identified Transactions not previously disclosed in response to subparagraph E of paragraph 1." (R. 34, Mar. 17, 2003 Mot. to Compel.) Finally, on June 2, 2003, Petitioner moved to compel information pursuant to paragraph 3 of the Agreed Order, which requires production of Andersen's files and access to Andersen employees who can provide testimony responsive to the summonses. Andersen, through privilege logs prepared by several of its former clients, withheld on the basis of privilege, attorney work product and responsiveness documents otherwise within the universe of documents sought by the government. Petitioner requested in its motion to compel a finding by this Court that none of the materials were privileged and an order compelling production of the documents.

What followed was a flurry of briefing on the issues delineated by this Court as well as on a host of tangential issues unrelated to the identity privilege, but relevant to Petitioner's subsequent motions to compel compliance or Intervenors' theories as to why the summonses are unenforceable as to them. Compounding this procedural morass, nearly ten more parties sought to intervene in order to raise various objections to enforcement of the Agreed Order.

3

During the briefing of the identity-privilege issue, a similar summons enforcement action was proceeding on appeal in the Seventh Circuit, which also raised the issue whether an investor may assert an identity privilege under § 7525(a) to bar disclosure of his identity under 26 U.S.C. §§ 6111, 6112. *See United States v BDO Seidman*, Nos. 02-3914, 02-3915 (7th Cir. 2003). The district court in that case held that the investors could assert no such privilege. On appeal, the Seventh Circuit remanded the case to the district court for fact-finding on four specific inquiries relevant to establishing whether the § 7525(a) privilege applied to those taxpayers. On remand, the district court reviewed various confidentiality agreements, consulting agreements and engagement letters entered into between BDO Seidman and the Doe intervenors. Applying the four inquiries raised by the Seventh Circuit, the district court determined that the identities of at least 55 of the Does were not subject to the § 7525(a) privilege because many of the confidentiality agreements demonstrated that the Does engaged BDO's services in part for the preparation of tax returns, which the district court held destroyed the necessary expectation of confidentiality for the privilege to apply. The district court also noted that several consulting agreements contained a "No Warranty" provision, which specified that BDO's services do not include any legal and/or tax opinions, a position that was fatal to the Does' claim that they were entitled to invoke the taxpayer-tax practitioner privilege under § 7525.

Taking our cues from the Seventh Circuit's remand, we ordered the Intervenors and Andersen to produce *in camera* any documents that they believed supported their assertion that the § 7525 privilege applied. After reviewing those documents, this Court was satisfied that (1) the documents sufficiently established the requisite elements to invoke the § 7525(a) privilege;

4

and (2) that the factual differences between the documents produced in the instant case and those produced on limited remand in the *BDO Seidman* case warranted our finding that the privilege was properly asserted here.

On July 2, 2003,[1] we entered an order denying Petitioner's March 17, 2003 motion to compel compliance, upholding the Does and Poes' assertion of an identity privilege under § 7525(a) and granting them the right to proceed under fictitious names. On July 16 the petitioner moved to alter or amend our July 2 rulings on various grounds. On July 23, 2003, the Seventh Circuit issued its opinion in the *BDO Seidman* case, holding that those Intervenors could not demonstrate a "colorable claim of privilege" in their identities under § 7525. As a result, Petitioner withdrew its original motion to amend and filed a revised motion that logically includes an argument for reconsideration in light of the Seventh Circuit's ruling. Presently before the Court is Petitioner's revised motion to alter or amend our July 2, 2003 Order denying its motion to compel compliance with paragraph 2(B) of the Agreed Order. (R. 78-1.)

## LEGAL STANDARDS

A motion to reconsider is not designed to relitigate issues previously decided, nor is a reconsideration motion an appropriate forum for arguing matters that could have been heard during the pendency of the previous motion. *Caisse Nationale de Credit Agricole v. CBI Indus., Inc.*, 90

---

[1] Unfortunately, this Court inadvertently issued its Memorandum Opinion and Order upholding the Does and Poes' identity privilege prior to receiving one additional brief the Petitioner requested in open court on June 26, 2003 and filed on July 2, 2003, a fact that Petitioner has pointed out no less than seven times in its subsequent filings before this Court. We, of course, aim to remedy in this opinion any oversight created by our issuing the July 2 Order prematurely.

5

F.3d 1264, 1269-70 (7th Cir. 1996). "Motions for reconsideration serve a limited function: to correct manifest errors of law or fact or to present newly discovered evidence." *Caisse Nationale*, 90 F.3d at 1269 (internal citations and quotations omitted). Such motions cannot in any case be employed as a vehicle to introduce new evidence that could have been adduced during the pendency of the prior motion. *Id.* Rule 59(e) permits a district court to entertain a motion to alter or amend the judgment. *Russell v. Delco Remy Div. of Gen. Motors Corp.*, 51 F.3d 746, 749 (7th Cir. 1995). Such motions, however, "must clearly establish either a manifest error of law or fact or must present newly discovered evidence." *Fed. Deposit Ins. Corp. v. Meyer*, 781 F.2d 1260, 1268 (7th Cir. 1986) (internal citations omitted); *see also C.H. Robinson Worldwide, Inc. v. Nat'l Prods. Corp.*, No. 01 C 6348, 2002 WL 99735, at *1 (N.D. Ill. Jan. 25, 2002).

## ANALYSIS

In its motion to alter or amend, Petitioner claims that: (1) this Court's July 2, 2003 Order is "in direct conflict" with the Seventh Circuit's decision in *United States v. BDO Seidman*, -- F.3d -- -, 2003 WL 21699744 (7th Cir. July 23, 2003); (2) we interpreted the Temporary Regulations under 26 U.S.C. § 6112 in a way that conflicts with the IRS interpretation and the plain language of the statute; (3) we failed to address the impact of the corporate exception to the § 7525(a) privilege; and (4) we must compel disclosure of the identities of any investor who did not timely intervene to assert an identity privilege under § 7525(a). In response, the Does renew their argument that the transaction in which they participated is not responsive to the summonses and thus we should make a determination of responsiveness before permitting Andersen to turn over information relating to that transaction to the IRS. The Poes also renew their argument that the

information sought by the government is premature and we should make a threshold determination whether the 1995 through 2002 transactions for which Andersen provided tax advice meet the list maintenance requirements set forth under Section 6111 and 6112 before permitting any individual taxpayer's information to be released. We will address each argument in turn.[2]

**I. Impact of the Seventh Circuit's *BDO Seidman* opinion on this Court's July 2, 2003 Order**

Petitioner first contends that the Seventh Circuit's *BDO Seidman* opinion, "a case identical in all material respects to the one before this Court," (R. 78, Pet.'r's Mot. to Alter at 4), held as a matter of law that there is no privilege in identity under § 7525. Thus, Petitioner concludes, "[b]ecause this Court's July 2 Order is in direct conflict with the Seventh Circuit's decision in *BDO Seidman*," we must amend our prior order upholding the Does and Poes' identity privilege. Petitioner further reasons that because the Seventh Circuit ruled that, *as a matter of law*, there is no privilege in identity, the Seventh Circuit's limited remand for fact-finding was unnecessary, and thus this Court's fact-finding inquiry to ascertain whether the Does and Poes could assert a privilege also was "misplaced." (*Id.* at 7 n.8.)

The Does and Poes, on the other hand, stress that the factual differences between the *BDO Seidman* taxpayers and their relationship and transactions with Andersen does not undermine this

---

[2] During the briefing of the present motion, we received an additional motion to intervene by taxpayers Richard and Rita Roe. They also filed a brief opposing the enforcement of Petitioner's June 2, 2003 motion to compel compliance with paragraph 3 of the Agreed Order, which as noted above, deals with the production of documents listed on privilege logs. That issue, however, is not pending before the Court at this time. Thus, we deny the Roes' motion to intervene without prejudice; they may renew their opposition to Petitioner's June 2 motion to compel during the briefing on that motion. We also note that to the extent that Andersen has not turned over Roes' identities to Petitioner, they must do so because the Roes did not timely intervene to assert an identity privilege.

7

Court's July 2 Order, despite the Seventh Circuit's contrary result in the *BDO* case. According to Intervenors, *BDO* confirms the existence of a tax-practitioner privilege, including in identity, that is analogous to the attorney-client privilege. They further assert that the *BDO* opinion recognizes that the § 7525 privilege is driven by the *client's* expectation of confidentiality, which was notably absent in the case of the *BDO* taxpayers, but present in the instant case.

Specifically, Intervenors note that the primary reason the Seventh Circuit ruled that the *BDO* taxpayers could claim no identity privilege is because the facts of that case demonstrated that they had no reasonable expectation of confidentiality as to their identity. Those taxpayers: (1) had employed BDO, at least in part, for preparation of their tax returns in connection with the potentially abusive transactions, and thus had abrogated any expectation of confidentiality in those transactions; (2) had entered into agreements with BDO that expressly warranted that BDO's services did not include legal advice or tax opinions, a fact that undercut their claim of privilege; and (3) conceded that none of the other documents at issue in the summonses were privileged aside from their identities. The Intervenors here, however, point to a number of factual differences that they claim uphold their assertion of an identity privilege. First, the Does claim that unlike *BDO*, Andersen did provide tax advice and tax opinions to them, none of which was used to prepare tax returns. Second, the Does assert that their transaction differed from the cookie-cutter tax shelters sold and promoted by BDO; Andersen specifically tailored the Doe transaction to achieve very specific family succession goals. Third, the Does claim that unlike the BDO taxpayers, who conceded that none of the documents were subject to the § 7525 privilege, they will assert privileges over many of the documents relating to their transaction. Finally, the Poes argue that

they have a colorable claim of privilege in their identities because, as demonstrated in the engagement letter attached to their response, they were under the express understanding that the transaction for which Andersen provided tax advice was not subject to the reporting and list-maintenance requirements of § 6111 and § 6112. Thus, the Poes claim that their case differs from the *BDO* taxpayers because they held a legitimate expectation of confidentiality in their relationship with Andersen.

In reply, Petitioner emphasizes its belief that the Seventh Circuit's holding was not based on any specific factual findings. (R. 88, Pet'r's Reply at 3.) Petitioner further claims that the mere possibility that their transaction could be subject to the list maintenance requirements of § 6111 is sufficient to eliminate any expectation of confidentiality that the Does and Poes held regarding their transactions. Finally, Petitioner takes issue with the Intervenors' assertion that the United States must first prove that the transactions under investigation are subject to the list-maintenance requirements of § 6112 before obtaining information about the taxpayers who participated in them; we address this last point in more detail below.

Our close reading of the *BDO* opinion leaves us somewhat puzzled as to the correct outcome of this case. We find it difficult to ascribe no significance to the Seventh Circuit's remand for fact finding, as Petitioner would have us do, (R. 78, Pet'r's Br. at 1), because, as noted below, those inquiries directly comport with our understanding of how we are to ascertain whether a privilege exists. Yet the language at the end of the *BDO* opinion sweeps very broadly, dipping into legislative intent and other IRS policy considerations, and does not explicitly base its holding

on the specific facts surrounding the *BDO* taxpayers, although the Court does acknowledge the district court's findings of fact at the beginning of the opinion.

Our understanding, and the one we applied in making our decision on July 2, is that determining whether an identity privilege exists under § 7525 involves a three-step inquiry. First, § 7525 permits the same common-law protections of confidentiality between a taxpayer and a tax practitioner as would exist between a taxpayer and his attorney, so long as the taxpayer was seeking tax advice from the practitioner. 26 U.S.C. § 7525(a). Thus, our first inquiry was whether the taxpayer sought tax advice from his tax practitioner. Then, we analyzed the requirements underlying a general, common-law claim of attorney-client privilege, since the § 7525 privilege is co-extensive with that privilege. *Id.* An attorney-client privilege exists when a client seeks legal advice from a professional legal advisor in his capacity as such, the communication is made in confidence and the communication relates to the purpose of obtaining legal advice. *United States v. Evans*, 113 F.3d 1457, 1461 (7th Cir. 1997). If these same requirements are satisfied in the tax context, then a taxpayer generally may assert a § 7525 privilege. The issue of whether a taxpayer may assert an identity privilege, however, requires a third level of inquiry. As noted in our prior opinion, as well as in the Seventh Circuit's *BDO* opinion, a client's identity generally is not privileged unless revealing the client's name would inevitably result in revealing the client's motivation for seeking representation, because motivation itself is a confidential communication protected by the attorney-client privilege. *See In re Grand Jury Proceeding (Cherney)*, 898 F.2d 565, 568 (7th Cir. 1990). The Seventh Circuit's four factual inquiries on remand mirrored this tripartite analysis, and we employed the same process in our analysis of whether to permit the

privilege as to Intervenors. Such an inquiry is obviously fact-intensive, and focuses on the relationship between the taxpayer and his practitioner, the purpose behind their interactions and whether the communications were made in confidence.[3] That being said, however, some of the more broad language in the Seventh Circuit's opinion leads us to question the role of our factual inquiries under that holding.

After outlining a similar analysis, including an in-depth discussion of two prior cases holding that the attorney-client privilege could prevent the disclosure of a client's identity, *see In re Grand Jury Proceeding (Cherney)*, 898 F.2d 565 (7th Cir. 1990); *Tillotston v. Boughner*, 350 F.2d 663 (7th Cir. 1965), the Seventh Circuit summarizes the Does' argument as "any document produced in response [to the IRS's detailed descriptions of potentially abusive tax shelters] that also reveals a client's identity will inevitably reveal that client's motivation for seeking tax advice from BDO" and thus creates an identity privilege. *BDO*, 2003 WL 21699744, at *7. The Seventh Circuit then rejects this argument, concluding that the "Does have not established that a confidential communication will be disclosed if their identities are revealed in response to the summonses." *Id.* at *8. The Seventh Circuit based this conclusion on two premises that appear to be wholly separate from and more broadly applicable than the district court's fact finding. First, the Seventh Circuit noted that it is unclear what motive can be inferred from the fact that the Does

---

[3] As this analysis demonstrates, an examination of documents is relevant to determining whether a taxpayer may claim an identity privilege because certain documents may establish the parameters of the relationship between the taxpayer and his practitioner, as well as each party's expectation of confidentiality in the transaction at hand. This does not, contrary to Petitioner's argument otherwise, necessarily reflect a determination as to whether the content of a particular document is privileged. (R. 88, Pet'r's Reply at 4.)

11

participated in one of the twenty types of tax shelters described in the summonses because the government knows very little about the substance of the transactions between *BDO* and their Does. Second, the court noted the Does' participation in potentially abusive tax shelters is information ordinarily subject to full disclosure under the tax law, which precludes the Does from establishing an expectation of confidentiality in their communications with BDO. With respect to this last point, the Seventh Circuit broadly concludes without qualification that "BDO's affirmative duty to disclose its clients' participation in potentially abusive tax shelters renders the Does' situation easily distinguishable from the limited circumstances in which we have determined that a client's identity was information subject to the attorney-client privilege." *Id.*

Thus, it appears that the Seventh Circuit intended in *BDO* to pronounce a generally applicable prohibition on the assertion of the identity privilege in IRS summons enforcement actions that does not seem altered by differing factual scenarios. Given the opinion's emphasis on the legislative intent underlying the §§ 6111 and 6112 registration requirements and the regulatory context favoring transparency of all participants in potentially abusive tax shelters, *id.* at *4, and following our Circuit's precedent, as we must, *United States v. Glaser*, 14 F.3d 1213, 1216 (7th Cir. 1994), we hold that in light of the Seventh Circuit's ruling in *BDO Seidman*, the Does and Poes may not assert a privilege in their identities pursuant to 26 U.S.C. § 7525.[4]

---

[4] In light of this holding, we need not address the questions whether we misapplied the Temporary Regulations under § 6111 or whether the corporate exception under 26 U.S.C. § 7525(b) applies to vitiate any asserted privilege. We recognize, however, that the corporate-exception issue will undoubtedly arise again in response to the Petitioner's latest motion to compel production of documents contained within various Intervenors' privilege logs. (R. 39-1.) We will address the issue at that time and will expect the parties briefing the issue to provide us with sufficiently detailed and clear descriptions of the role of any corporations involved, directly

## II. Responsiveness of the Does' Transaction to the Summonses and Prematurity of Government Inquiries

The Does and the Poes raise two additional arguments. First, the Does renew their argument raised in June that none of the transactions outlined in the IRS summonses encompass the transaction in which they participated. The Does ask this Court to engage in a detailed analysis of their transaction to determine whether it falls within the summonses. The Poes raise a similar argument that focuses on the timing of the release of information. According to the Poes:

> The Government has clearly claimed that the purpose of its investigatory examination in this proceeding is to determine whether Respondent Andersen complied with the registration and list maintenance requirements of Sections 6111 and 6112. At no point, however, has the Government presented to this Court any support, factually or legally, for a conclusion that the [transactions] for which Andersen provided tax advice meet the list maintenance requirements set forth under Section 6111 and 6112. Instead, they simply assume . . . speculative facts not in this record regarding Sections 6111 and 6112.
>
>        \*           \*           \*
>
> [T]he Government began this summons proceeding under its ostensible Sections 6111 and 6112 authority to investigate Respondent Andersen, but now has made the mammoth leap to ask this Court to make the unsubstantiated assumption that Respondent Andersen's client identities and information must be turned over due to an absence of a Section 7525 privilege. The Government makes this leap by sidestepping (or even overstepping) its investigation of whether Respondent Andersen was required to maintain certain information under Sections 6111 and 6112 . . . .

---

or indirectly, in these transactions as well as an explanation of any tax benefits accruing to those corporations as a result of a taxpayer's participation in a transaction listed in the summonses. Furthermore, any additional explanation of the treatment and/or definitions of tax shelters (including "corporate tax shelters") under the Code would be helpful.

13

(R. 79, Poes' Resp. at 7-8, 10.)

Petitioner's response to these arguments is that "[t]he United States need not establish that the transactions which it will review to determine whether Arthur Andersen should have registered them . . . or . . . maintained lists of participants . . . are in fact tax shelters" **before** it learns the identities of the participants. Petitioner offers as a reason the same rationale it has maintained before this Court and before the Seventh Circuit during oral argument in the *BDO Seidman* case—that "[a] necessary part of the examination of Arthur Andersen's potential liabilities is an examination of each of the transactions which could potentially have imposed registration and list maintenance requirements on Arthur Andersen," which may involve interviewing the participants. (R. 88, Pet'r's Reply at 5.) With respect to the Does' responsiveness argument, Petitioner also emphasizes that this is an action against Andersen, for which the Does have no standing to intervene unless they can establish a legally protectable interest (in this case a claim of privilege). (*Id.* at 11.)

But in the last hearing before this Court, Petitioner admitted that a primary focus of its investigation was not simply to collect promoter penalties against the now-defunct Andersen, but also to uncover, open investigations of and seek penalties from the taxpayers who participated in Andersen's transactions: "[W]e believe that many of the Does' and Poes' statutes of limitations are going to expire on August 15th, and we would like to see this matter resolved as quickly and as soon as possible so that, perhaps, . . . the United States would be able to open examinations . .

. ." (*See* Tr. of July 24, 2003 Hr'g at 3-4.)[5] We recognize that the Supreme Court has sanctioned such dual-purpose investigations where the summoned party itself is being investigated. *See Tiffany Fine Arts, Inc. v. United States*, 469 U.S. 310, 322 (1985). But we are also cognizant of the dangers of an unfettered exercise of the IRS summons power, including an unreasonable infringement on the taxpayer's right to privacy. *Id.* at 316. Perhaps in time Congress will make explicit a purpose hinted at in the legislative history underlying §§ 6111 and 6112—that the mechanisms in those sections expressly targeting promoters also permit the IRS to target for penalties the taxpayers who participated in the potentially abusive transactions. At that point, Petitioner's broad statements about the scope of the IRS's investigatory powers under those sections will ring more true than it does here where Petitioner is simply bootstrapping taxpayer investigations through a mechanism designed to target promoters. In summary, we are troubled by the potential ramifications of Petitioner's invocation of the broad reach of its powers under §§ 6111, 6112 and 7602 without concomitant protections to subsidiary targets of that investigation, especially where, as here, the summoned party's self-interest and incentive to oppose enforcement may not be sufficient to protect against "the evils that Congress sought to remedy when it enacted [the John Doe summons procedure under] § 7609(f)." *See Tiffany Fine Arts*, 469 U.S. at 322.

---

[5] *Compare* Petitioner's position at an earlier hearing on the responsiveness issue: ""[I]n fact Andersen is the person or the entity being investigated here . . . it is a summons that's investigating their potential liabilities, and a third party has no right to intervene in an action to determine whether what Andersen is providing is responsive to summons investigating that – the target of that investigation." (Tr. of June 12, 2003 Hr'g at 6-7.)

Unfortunately, the procedural history in this case is not conducive to granting the Intervenors' requests. Due to their claim of privilege, the Does have not moved to quash the summons nor provided us or Petitioners, on a non-confidential basis, a detailed explanation with accompanying documents of the precise reasons why their transaction falls outside the scope of the summonses.[6] Similarly, although we agree with the Poes' assessment of Petitioner's approach to this summons enforcement proceeding, *see* page 13 *supra*, we do not feel we are in a position at this point in the proceeding to backtrack and require Petitioner to establish *de facto* violations of §§ 6111 and 6112 by Andersen or the responsiveness of various transactions to the summonses before continuing its investigation. Thus, Intervenors' requests for an inquiry into responsiveness and prematurity are denied.

### III. Revealing the Identities of Does who did not Timely Intervene

Andersen filed a response indicating that six of its former clients failed to intervene by the February 12, 2003 deadline set by this Court for persons who wished to assert an identity privilege. Yet those persons' identities have not been disclosed to Petitioner. In our July 2 Order, we permitted only the Does and Poes, and no other Andersen clients, to assert an identity privilege and to proceed under a pseudonym. (R. 71, July 2, 2003 Order at 10.) And, of course, our ruling today, which removes the identity privilege for even the timely intervening Does and Poes, applies equally to the six Andersen clients whose identities have not been disclosed. Thus, the identities of those six Andersen clients must be disclosed to Petitioner.

---

[6] We recognize that the Does offered to produce *in camera* documents supporting their responsiveness claim, but, as noted above and as our July 2 Order demonstrates, the Court's decisional process is hampered when it does not have the benefit of briefs from all parties who have equal access to the documents at issue.

16

## CONCLUSION

For the foregoing reasons, we grant Petitioner's motion to alter or amend our July 2 Order and hold that the Does and Poes' identities must be revealed to Petitioner. (R. 78-1.) Second, we deny the Does' request for a determination of the responsiveness of its transaction to the IRS summonses. (R. 52-1.) Finally, we order that the identities of Andersen Doe numbers one through four and six through seven must be disclosed to Petitioner because they did not timely intervene in February 2003 to assert an identity privilege and because they may not otherwise assert such a privilege as stated in this opinion.

ENTERED:

Judge Ruben Castillo
United States District Court

Dated: August 15, 2003